J-A04014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| FRANK C. MAMONE AND LINDA MAMONE, HUSBAND AND WIFE, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| ST. CLAIR MEMORIAL HOSPITAL; OWEN T. TRAYNOR, M.D. & UPMC EMERGENCY MEDICINE, INC., | |
| Appellees | No. 787 WDA 2014 |

Appeal from the Judgment Entered May 12, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-09-013201

BEFORE:  OLSON, WECHT AND STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED APRIL 21, 2015**

Appellants, Frank C. Mamone ("Mr. Mamone") and Linda Mamone ("Mrs. Mamone"), appeal from the judgment entered on May 12, 2014. We affirm.

The factual background of this case is as follows. According to Mrs. Mamone, at approximately 6:30 a.m. on July 20, 2007, she was tossing and turning in bed at which time Mr. Mamone asked her if she were okay. At 7:00 a.m., Mrs. Mamone awoke and discovered that Mr. Mamone, who was lying next to her, was unresponsive. Mr. Mamone was transported via ambulance to St. Clair Memorial Hospital ("St. Clair"). Mr. Mamone arrived at St. Clair at 7:56 a.m. At 8:00 a.m., nurse Mellissa Vietmeier ("Ms.

* Retired Senior Judge assigned to the Superior Court

Vietmeier") administered the National Institute of Health Stroke Scale ("NIHSS") test. She documented a score of 16. Dr. Owen T. Traynor ("Dr. Traynor") began to care for Mr. Mamone at 8:07 a.m. Dr. Traynor was employed by UMPC Emergency Medicine, Inc. ("UPMC"). At 8:15 a.m., Mrs. Mamone arrived at St. Clair after driving herself.

At 8:50 a.m., Dr. Traynor ordered a CT scan of Mr. Mamone's brain. At 9:07 a.m., the radiologist informed Dr. Traynor that the CT scan was negative. At 11:26 a.m., Dr. Traynor requested a neurological consultation. After this consultation, Mr. Mamone was transferred to UPMC Presbyterian-Shadyside Hospital ("Shadyside") for surgery to remove the blood clot in his brain. As a result of the stroke, Mr. Mamone suffered permanent brain damage.

We also briefly review relevant medical issues in this case. Generally, there are two types of strokes, ischemic and hemorrhagic. Ischemic strokes are caused by a blockage in a blood vessel in the brain while hemorrhagic strokes are caused by the rupture of a blood vessel in the brain. It is undisputed that the standard of care for the treatment of ischemic strokes, both in July 2007 and presently, calls for the administration of recombinant tissue plasminogen activator ("tPA") within three hours of the patient last being neurologically normal. When a patient wakes up with stroke symptoms, it is called a wake-up stroke and the patient is considered to have last been neurologically normal when he or she fell asleep as there is

no way of knowing when the stroke began. The tPA treatment is administered intravenously and generally is able to dissolve the clot in the blood vessel. However, tPA cannot be safely administered to patients suffering from a hemorrhagic stroke nor to patients that have been suffering an ischemic stroke for longer than three hours.

The relevant procedural history of this case is as follows. Appellants commenced this action on July 22, 2009 by filing a writ of summons. On October 19, 2009, Appellants filed a complaint against, *inter alia*, Dr. Traynor, St. Clair, and UPMC (collectively "Defendants"). Appellants' complaint alleged that Dr. Traynor committed medical malpractice. The complaint further alleged that St. Clair and UPMC were vicariously liable for Dr. Traynor's malpractice.

On or before September 18, 2012, Appellants served Defendants with several expert reports, *inter alia*, an expert report authored by Dr. Steven R. Levine ("Dr. Levine"). On August 28, 2013, Defendants disclosed that Dr. James M. Gebel, Jr. ("Dr. Gebel") would serve as an expert witness on their behalf.[1] On September 23, 2013, Dr. Gebel authored an expert report. Appellants filed a motion to compel and, on October 2, 2013, Appellants

---

[1] The large gap between the filing of Appellants' expert report and Defendants' disclosure of Dr. Gebel as an expert was caused by a procedural irregularity. Trial was originally scheduled to commence in March 2013 and Appellants' report was filed based upon that trial date. Thereafter, however, Appellants requested a continuance. Trial was then rescheduled for October 2013 and Defendants' disclosure was made pursuant to the deadlines established for the new trial date.

received Dr. Gebel's expert report. On October 9, 2013, Appellants filed Dr. Levine's supplemental expert report. On October 24, 2013, Defendants filed Dr. Gebel's supplemental expert report.[2]

On October 25, 2013, Defendants moved to quash notices to attend/notices to produce directed to representatives of St. Clair and UPMC. That same day, Defendants moved *in limine* to prohibit cross-examination of Dr. Traynor regarding any authoritative source. On October 28, 2013, Appellants moved *in limine* to strike Dr. Gebel's supplemental expert report. Jury selection occurred on October 28, 2013. On October 29, 2013, the trial court denied Appellants' motion *in limine*, granted Defendants' motion *in limine* in part (permitting cross-examination of Dr. Traynor using only the American Stroke Association's Guidelines for the Early Management of Adults with Ischemic Stroke ("ASA Guidelines")), and granted Defendants' motions to quash. That same day, the jury was sworn and trial commenced. On November 6, 2013, the jury returned a verdict in favor of Defendants. The jury concluded that Dr. Traynor did not breach the standard of care.

---

[2] Appellants argue that this supplemental expert report was filed at 2:00 p.m. on October 25, 2013. The certified record reveals, however, that the supplemental expert report was filed at 2:50 p.m. on October 24, 2013. **See** Defendants' Supplemental Pretrial Statement, 10/24/13, at 1.

J-A04014-15

Appellants filed a post-trial motion on November 15, 2013. The trial court

denied the post-trial motion on April 24, 2014. This timely appeal followed.[3]

Appellants present four issues for our review:

1. Whether the trial court erred by refusing to grant [Appellants'] motion to strike/motion *in limine* to preclude testimony of [Dr. Gebel] as to matters set forth in a supplemental report dated October 22, 2013, served on the eve of trial, identifying new and difficult medical issues that [Appellants] were required to address at trial without a reasonable time to consult with medical experts[?]

2. Whether the trial court erred by permitting Dr. Gebel to testify to a congenital absence or abnormality of [Mr. Mamone's] posterior communicating artery, which went beyond the fair scope of both his original and supplemental reports[?]

3. Whether the trial court erred by granting Defendants' motion *in limine* limiting [Appellants'] cross-examination of [Dr. Traynor] and prohibiting [Appellants] from cross-examining Dr. Traynor as to any authoritative sources other than the [ASA Guidelines?]

4. Whether the trial court erred by granting Defendants' motions to quash notices to attend/notices to produce directed to designated representatives of [St. Clair and UPMC] which sought testimony related to a staffing agreement between [St. Clair and UPMC] and the operation of [St. Clair's] emergency department[?]

Appellants' Brief at 5 (certain capitalization and honorifics omitted).

In their first issue, Appellants contend that the trial court erred by

denying their motion *in limine* to strike Dr. Gebel's supplemental expert

---

[3] On May 16, 2014, the trial court ordered Appellants to file a concise statement of errors complained of on appeal ("concise statement"). **See** Pa.R.A.P. 1925(b). On May 22, 2014, Appellants filed their concise statement. On August 19, 2014, the trial court issued its Rule 1925(a) opinion. All issues raised on appeal were included in Appellants' concise statement.

report. "When reviewing a ruling on a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court and our review is for an abuse of discretion." ***Commonwealth v. Parker***, 104 A.3d 17, 21 (Pa. Super. 2014) (citation omitted). "An abuse of discretion occurs where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record." ***Commonwealth v. Adams***, 104 A.3d 511, 517 (Pa. 2014) (internal quotation marks and citation omitted).

Pennsylvania Rule of Civil Procedure 4003.5 provides, in relevant part,

[(a)(1)(B)] A party may through interrogatories require . . . the other party to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his or her answer a report of the expert or have the interrogatories answered by the expert.

* * *

(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto.

Pa.R.C.P. 4003.5.

Furthermore,

An expert report . . . shall encompass all issues in the liability phase of the case, including issues of professional negligence

and causation of harm, for which a party to whom a request has been directed will offer expert testimony at trial in support of claims made against the requesting party or in support of defenses raised to the requesting party's claims. The report shall reflect the best information available to the party producing the report at the time it is produced.

Pa.R.C.P. 1042.27(b)(2).

Finally, with respect to the filing and production of expert reports prior to trial, the local rules of the Court of Common Pleas of Allegheny County provide that:

After a plaintiff has filed a praecipe requesting that the case be placed on the next available trial list, each other party in the case shall file within [60] days expert reports summarizing all expert testimony that will be offered by that party to support the defenses to the plaintiff's claims and to support any claims and defenses involving other parties. After [60] days, each other party's right to file additional/supplemental reports is subject to the provisions of subsection (7)(d) of this local rule.

(d)(i) A party may file a supplemental expert report which responds to an opposing expert report within [60] days after the opposing expert report was filed.

(ii) Except as provided in subsection (7)(d)(i), a party may not file a supplemental expert report which introduces a new theory of liability of causation or a new defense without leave of Court for good cause shown.

(iii) Except as provided in subsection (7)(d)(i), a party may not subsequently file an expert report prepared by a new expert without leave of Court for good cause shown.

Allegheny County Local Rule 4003.5(7).

Appellants contend that Dr. Gebel's supplemental expert report violated Local Rule 4003.5(7)(d)(ii) because it introduced new defenses. This argument, however, fails to recognize that Dr. Gebel's supplemental

expert report was filed in response to Dr. Levine's October 9, 2013 supplemental expert report – which was filed two weeks prior to the commencement of trial. The new topics addressed in Dr. Gebel's supplemental expert report were in direct response to Dr. Levine's supplemental expert report and, therefore, Defendants were not required to seek leave of court to file Dr. Gebel's supplemental expert report.

In his supplemental expert report, Dr. Levine opined that, "If, [] as Dr. Gebel opines, [Mr. Mamone] was far outside the [three]-hour window with a wake-up stroke then his head CT scan would almost certainly have evidence of ischemic changes more obvious than those seen on the imaging." Dr. Levine Supplemental Expert Report, 10/9/13, at 3. Dr. Levine further opined that "[T]he conclusion that Dr. Gebel reaches about being 'essentially 100% certain' that [Mr. Mamone] would not have achieved successful recanalization had such a therapy been attempted is not accurate[.]" *Id.* at 5. Dr. Levine similarly opined that, "The negligence of Dr. Traynor caused and/or increased [Mr. Mamone's] risk of developing the type of permanent deficits that he developed subsequent to and as a direct result of his ischemic stroke[.]" *Id.* at 2.

Appellants primarily object to Dr. Gebel's opinions, in his supplemental report, regarding imaging studies that were done at Shadyside. These opinions, however, were in direct response to Dr. Levine's supplemental expert report. Specifically, Dr. Gebel stated that the ischemic changes

referenced by Dr. Levine were actually present in the CT scans and supported his opinion that Mr. Mamone experienced a wake-up stroke and the alleged interaction with Mrs. Mamone at 6:30 a.m. did not constitute the last time Mr. Mamone was neurologically normal. Dr. Gebel's opinions with respect to the scans at Shadyside also refuted Dr. Levine's opinion that administration of tPA would likely have prevented the injuries that Mr. Mamone suffered as a result of the stroke.

We find instructive this Court's decision in **Keffer v. Bob Nolan's Auto Serv., Inc.**, 59 A.3d 621 (Pa. Super. 2012), *appeal denied*, 69 A.3d 602 (Pa. 2013). In that case, the defense expert filed a supplemental expert report which expressed opinions in response to the plaintiff's expert's supplemental report. The plaintiff thereafter moved to strike the defense expert's supplemental report and to bar the defense expert from testifying as to the newly expressed opinions. This Court held that:

> The record is devoid of any evidence of a willful violation of the discovery rules or bad faith by the [d]efendants. The [d]efendants did not hide the identity of their expert and did not attempt a "trial by ambush." On the contrary, [the] supplemental report was necessary only because [plaintiff's] supplemental report introduced new issues in responding to [the defense expert's] two prior reports.

*Keffer*, 59 A.3d at 654.

The same thing occurred in this case. Dr. Levine's supplemental expert report included new opinions in response to Dr. Gebel's original expert report. Dr. Gebel therefore responded by filing a supplemental

expert report that addressed Dr. Levine's new opinions. Such a practice has become commonplace in today's civil litigation, particularly in medical malpractice litigation. It does not amount to trial by ambush; rather, it permits both parties to narrow the issues for trial by highlighting the opinions that will be offered by expert witnesses for the factfinder's consideration. As Dr. Gebel's supplemental expert report was a legitimate response to Dr. Levine's supplemental expert report, the trial court did not abuse its discretion in denying Appellants' motion to strike Dr. Gebel's supplemental expert report.

Furthermore, even if the trial court erred by denying Appellants' motion *in limine*, that error was harmless. "An error is harmless if the court determines that the error could not have contributed to the verdict." ***Bensinger v. Univ. of Pittsburgh Med. Ctr.***, 98 A.3d 672, 683 n.12 (Pa. Super. 2014) (internal alterations and citation omitted). Dr. Gebel's supplemental expert report is focused primarily on causation, not the standard of care or any departure therefrom. Specifically, Dr. Gebel's supplemental expert report discusses six discrete factors. The report summarizes these six factors and states that "[t]he only reasonable conclusion is that [Mr. Mamone] would have not in any way benefited from IV t[PA] (or any other recanalization) therapy had it been administered at any time from his arrival at St. Clair[.]" Dr. Gebel Supplemental Expert Report, 10/23/13, at 4. This conclusion, and a detailed review of the expert

opinions offered in this case by all parties, indicates that Dr. Gebel's discussion of the six factors only addressed causation and not the standard of care.

As

> [t]he jury found no negligence on the part of [the] defendant, [it] never reached the issues of causation or damages. Therefore, any error with regard to the testimony on causation was harmless and cannot be the basis for a new trial. . . . Plaintiffs suggest that the jurors may have decided there was no negligence because they thought there was no causation, but this is sheer conjecture.

*Zoppi v. Seok*, 51 Pa. D. & C.4th 541, 554–555 (C.C.P. Lehigh 2001), *aff'd*, 804 A.2d 72 (Pa. Super. 2002) (unpublished memorandum); *see Parr v. Ford Motor Co.*, 2014 WL 7243152, *14 (Pa. Super. Dec. 22, 2014) (*en banc*) (error in admission of causation evidence was harmless as the jury did not reach the issue of causation); *see also Boyle v. Indep. Lift Truck, Inc.*, 6 A.3d 492, 496 (Pa. 2010) (issue of comparative negligence went to causation and since the jury found that the defendant was not negligent any error regarding the admission of comparative negligence evidence was harmless); *Jewelcor Jewelers & Distribs., Inc. v. Corr*, 542 A.2d 72, 80 (Pa. Super. 1988), *appeal denied*, 569 A.2d 1367 (Pa. 1989) (same); *Mickey v. Ayers*, 485 A.2d 1199, 1203 (Pa. Super. 1984) (same); *Robinson v. Philadelphia*, 478 A.2d 1, 3-4 (Pa. Super. 1984) (same); *Ries v. MTD Products, Inc.*, 456 A.2d 211, 214 (Pa. Super. 1983) (same); *Dean v. Trembley*, 137 A.2d 880, 883 (Pa. Super. 1958) (same); *Whitton*

*v. H.A. Gable Co.*, 200 A. 644, 646 (Pa. 1938) (same); *cf. Harkins v. Calumet Realty Co.*, 614 A.2d 699, 707 (Pa. Super. 1992) (same with respect to superseding cause).

Appellants identify only three parts of Dr. Gebel's supplemental expert report that implicate the standard of care and suggest that Dr. Traynor breached a duty owed to Mr. Mamone by failing to administer tPA. These topics include (1) the fact that Mr. Mamone experienced a wake-up stroke; (2) the inability of St. Clair to provide tPA within 90 minutes; and (3) the size of Mr. Mamone's stroke.[4] However, the record confirms that Dr. Gebel's original expert report discussed these three issues. As to the wake-up stroke portion of the report, Appellants concede that Defendants' theory throughout the case was that Mr. Mamone suffered from a wake-up stroke. *See* Appellants' Brief at 12. In his original expert report, Dr. Gebel's first

---

[4] These three issues relate to standard of care, and not causation, because they impact whether or not Dr. Traynor should have administered tPA within the three-hour time frame. If Mr. Mamone suffered a wake-up stroke, he was not a candidate for tPA. If St. Clair were not equipped to diagnose a stroke and treat with tPA within 90 minutes, Dr. Traynor did not breach the standard of care. Finally, if Mr. Mamone had a large stroke he was not a candidate for tPA. Therefore, these three issues related to the jury's determination regarding whether Dr. Traynor breached the standard of care.

On the other hand, the remaining issues Dr. Gebel discussed in his supplemental expert report addressed what would have occurred if Dr. Traynor had administered tPA to Mr. Mamone within 90 minutes of his arrival at St. Clair. Dr. Gebel opined, in his supplemental expert report, that if Mr. Mamone had been administered tPA within that 90 minute timeframe it would have had little to no impact on Mr. Mamone's recovery from the stroke. Therefore, these other issues went to the issue of causation and not to the standard of care, or breach thereof.

opinion was that Mr. Mamone suffered from a wake-up stroke. Dr. Gebel Expert Report, 9/23/13, at 3. As to the ability of St. Clair to provide tPA within 90 minutes, that issue was also discussed in Dr. Gebel's original expert report. *Id.* at 4.

Appellants spend a significant portion of their brief arguing that Dr. Gebel's opinion related to the size of Mr. Mamone's stroke was a new addition to Dr. Gebel's supplemental expert report. Dr. Gebel's opinion regarding the size of Mr. Mamone's stroke, however, was discussed in Dr. Gebel's original expert report. Specifically, Dr. Gebel noted that, correctly calculated, Mr. Mamone had an NIHSS stroke score of 26. Dr. Gebel's Expert Report, 9/23/13, at 2. A large stroke is considered any stroke where the patient's NIHSS stroke score is greater than 20. Dr. Gebel's opinion relating to the size of Mr. Mamone's stroke was, therefore, within the fair scope of his original expert report. Thus, even if the trial court granted Appellants' motion to strike, Dr. Gebel's testimony on topics relating to standard of care identified by Appellants would not have been precluded. Accordingly, any error in failing to grant Appellants' motion *in limine* and strike Dr. Gebel's supplemental expert report was harmless.

In their second issue on appeal, Appellants argue that the trial court erred in permitting Dr. Gebel to testify regarding a congenital absence or abnormality of Mr. Mamone's posterior communicating artery. As this Court has explained:

> The admission of expert testimony is within the trial court's sound discretion and we will not disturb that decision without a showing of manifest abuse of discretion. An expert's testimony on direct examination is to be limited to the fair scope of the expert's pre-trial report. In applying the fair scope rule, we focus on the word fair. Departure from the expert's report becomes a concern if the trial testimony would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response. Therefore, the opposing party must be prejudiced as a result of the testimony going beyond the fair scope of the expert's report before admission of the testimony is considered reversible error. We will not find error in the admission of testimony that the opposing party had notice of or was not prejudiced by.

**Whitaker v. Frankford Hosp. of Phila.**, 984 A.2d 512, 522 (Pa. Super. 2009) (internal quotation marks and citation omitted); **see** Pa.R.C.P. 4003.5(c).

Appellants argue that Dr. Gebel never discussed a congenital absence or abnormality of Mr. Mamone's posterior communicating artery in his original expert report nor in his supplemental expert report. We conclude that the trial court did not abuse its discretion by permitting Dr. Gebel to testify regarding a congenital absence or abnormality of Mr. Mamone's posterior communicating artery because such testimony was within the fair scope of his expert reports.

Appellants' argument regarding Dr. Gebel's testimony is flawed for two reasons. First, Appellants entire argument is premised on the fact that certain terms were not present in Dr. Gebel's expert reports. For example, Appellants argue that, because Dr. Gebel's expert reports "never mention the terms 'congenital', 'anatomy', 'anatomical variation' or 'abnormality,'"

- 14 -

Dr. Gebel's testimony was outside the fair scope of his expert reports. Appellants' Brief at 41. Our Supreme Court, however, has rejected use of this "magic words" approach to determining if an expert's testimony is within the fair scope of his or her expert report. **See Mitzelfelt v. Kamrin**, 584 A.2d 888, 894 (Pa. 1990); **see also Expressway 95 Bus. Ctr., LP v. Bucks Cnty. Bd. of Assessment**, 921 A.2d 70, 79 (Pa. Cmwlth. 2007) (internal quotation marks and citation omitted) ("An expert's trial testimony that constitutes a reasonable explanation or even an enlargement of the expert's written words may be deemed to fall within the coverage of fair scope."). Instead, our Supreme Court has instructed that we must view Dr. Gebel's testimony in its entirety, along with his expert reports, to determine if the testimony was within the fair scope of his expert reports. **See Mitzelfelt**, 584 A.2d at 894; **see also Hickman v. Fruehauf Corp.**, 563 A.2d 155, 157 (Pa. Super. 1989), *appeal denied*, 596 A.2d 158 (Pa. 1991).

Furthermore, Appellants' argument is premised on the assumption that Dr. Gebel could only testify as to opinions set forth in his original expert report and not those opinions expressed in his supplemental expert report. This, however, is an incorrect interpretation of Rule 4003.5(c). Rule 4003.5(c) expressly states that an expert witness may testify regarding opinions that he or she offered in a supplemental report. In this case, as discussed above, the trial court declined to strike Dr. Gebel's supplemental expert report and we have determined that the trial court did not abuse its

- 15 -

discretion in so ruling. Therefore, Dr. Gebel was permitted to testify at trial regarding opinions included in both his original expert report and his supplemental expert report.

With these principles in mind, we carefully reviewed Dr. Gebel's original expert report and his supplemental expert report. When considered as a whole, we conclude that the expert reports fairly encompass his opinion expressed at trial that there was a congenital absence or abnormality of Mr. Mamone's posterior communicating artery. Specifically, in his supplemental expert report, Dr. Gebel opined there was "angiographic evidence of no or minimal left posterior communicating artery." Dr. Gebel Supplemental Expert Report, 10/23/13, at 4.

Dr. Gebel's supplemental expert report used the phrase "no or minimal" instead of the term "absence or abnormality." There is no substantive difference between this terminology. The word "absence" means "the fact of being without something; lack." Collin's English Dictionary (10th ed. 2012). Dr. Gebel's supplemental expert report opined that there was evidence that there was no, or lack of a, posterior communicating artery. Similarly, a posterior communicating artery that is normal is not "minimal." Thus, it is abnormal. *See id.* (defining abnormal as "not normal; deviating from the usual or typical; extraordinary."). Therefore, Dr. Gebel's trial testimony aligned closely with the opinion contained within his supplemental expert report. As such, Dr. Gebel's trial

testimony was within the fair scope of his expert reports and the trial court did not abuse its discretion by permitting him to testify regarding a congenital absence or abnormality of Mr. Mamone's posterior communicating artery.

Furthermore, even if the trial court erred by permitting Dr. Gebel's testimony, such error was harmless. Dr. Gebel's testimony regarding the absence or abnormality of Mr. Mamone's posterior communicating artery addressed causation. Specifically, this testimony attempted to prove that even if Dr. Traynor administered tPA within 90 minutes of Mr. Mamone's arrival at St. Clair, Mr. Mamone would not have successfully recovered. Contrary to Appellants' assertions, this testimony was not offered to prove that Dr. Traynor had breached the standard of care.[5] As noted above, when a trial court errs by admitting evidence relating to causation and the jury determines that the defendants were not negligent, such error is harmless. Accordingly, even if the trial court erred by permitting Dr. Gebel's testimony, Appellants would not be entitled to relief on appeal.

In their third issue, Appellants argue that the trial court erred by granting Defendants' motion *in limine* regarding the cross-examination of Dr. Traynor. The trial court ruled that Appellants could not cross-examine Dr.

---

[5] Appellants argue that the fact that Dr. Gebel was qualified as an expert regarding standard of care is dispositive. Dr. Gebel, however, was offered as an expert in both standard of care and causation. **See** N.T., 11/4/13, at 884. Accordingly, his opinions must be examined to determine if they addressed standard of care or causation.

Traynor with respect to any authoritative source other than the ASA Guidelines. Appellants argue that they intended to cross-examine Dr. Traynor regarding other learned treatises, *inter alia*, *The Streetmedic's Handbook*, Owen T. Traynor *et al* (2004).

We conclude that Appellants waived this issue. "It is axiomatic that 'issues not raised in the lower court are waived and cannot be raised for the first time on appeal.'" **Commonwealth v. Tejada**, 107 A.3d 788, 797 (Pa. Super. 2015), *quoting* Pa.R.A.P. 302(a) (internal alteration and other citation omitted). In this case, Defendants filed a motion *in limine* on the eve of trial seeking to prohibit Dr. Traynor from being cross-examined with any learned treatise or similar document. Appellants did not file a written response. The motion *in limine* was argued in chambers prior to the commencement of trial. The trial court asked Appellants' counsel "Do you have medical treatises you're going ---" N.T., 10/29/13, at 48. Before the trial court could finish its question, Appellants' counsel replied "Yeah. I'm going to ask him about the American Heart Association American Stroke Association guidelines." **Id.** The trial court ruled that such cross-examination was proper in this case. **See id.** at 48-49. Appellants' counsel did not aver that he was planning on using *The Streetmedic's Handbook* or any other learned treatise to cross-examine Dr. Traynor. Instead, after Appellants' counsel stated he was planning on using the ASA Guidelines, the trial court granted

Defendants' motion *in limine* in part and the parties proceeded to the next pre-trial matter.[6]

"One of the purposes of the waiver rule is to call alleged errors to the trial court's attention, and give the court the opportunity to correct the error." ***Stein v. Commw., Dep't of Transp., Bureau of Licensing***, 857 A.2d 719, 724 n.8 (Pa. Cmwlth. 2004) (citation omitted); ***see also Parker***, 104 A.3d at 29 (citations omitted). In this case, Appellants did not alert the trial court of the alleged error and give it an opportunity to correct itself. Instead, the trial court believed that it was ruling in Appellants' favor because it granted Appellants everything they requested – permission to cross-examine Dr. Traynor using the ASA Guidelines. In their reply brief, Appellants concede they did not give the trial court an opportunity to correct its alleged error. ***See*** Appellants' Reply Brief at 21 n.23 (conceding the trial court believed the parties had reached a stipulation regarding what Appellants could use to cross-examine Dr. Traynor). Appellants cannot thereafter argue that the trial court's ruling was erroneous and entitles them to a new trial. Accordingly, Appellants have waived their third issue on appeal.

---

[6] To the extent Appellants argue that this issue was preserved elsewhere in the record, that argument is waived. ***See*** Pa.R.A.P. 2117(c) (requiring that an appellant's brief include a statement of where an issue was preserved in the record); Pa.R.A.P. 2101 (allowing an appellate court to find waiver when an appellant fails to comply with the applicable rules of appellate procedure).

In their final issue on appeal, Appellants argue that the trial court erred by granting Defendants' motions to quash notices to attend/notices to produce directed to particular employees of UPMC and St. Clair. The notices to attend/notices to produce sought evidence relating to the staffing agreement between St. Clair and UPMC. We review the trial court's rulings on the motions to quash for an abuse of discretion.

Appellants argue that they were prejudiced by the trial court's quashal of their notices to attend/notices to produce because they did not have "the opportunity to present evidence regarding Dr. Traynor's obligations under the [s]taffing [a]greement[.]" Appellants' Brief at 52. They also argue that they were prohibited "from showing that Dr. Traynor had a separate duty to assist [St. Clair] in development of policies and procedures for [St. Clair's emergency department], including an organized protocol for treatment of ischemic stroke patients." *Id.* at 53-54. As this information was irrelevant to the issues at trial, the trial court did not abuse its discretion in granting Defendants' motions to quash.

Dr. Traynor's obligations under the staffing agreement were immaterial to this case. The complaint in this case only alleged that Dr. Traynor breached his duty of due care by failing to administer tPA to Mr. Mamone within the three-hour treatment window. *See* Complaint, 10/19/09, at 8-9. Appellants' complaint did not allege that Dr. Traynor was negligent in developing practices and procedures for St. Clair's treatment of

- 20 -

stroke patients. *See id.* Dr. Traynor's obligations and duties under the staffing agreement were therefore immaterial to determining whether he breached the standard of care with respect to Mr. Mamone's treatment. Furthermore, Appellants did not assert a separate claim against St. Clair and/or UPMC for having inadequate practices and procedures in place for the treatment of stroke patients. *See id.* Instead, the complaint only alleged that St. Clair and UPMC were vicariously liable for the actions of Dr. Traynor. *See id.* Accordingly, the information sought by the notices to attend/notices to produce was not relevant to this case. The trial court therefore acted within its discretion by granting Defendants' motions to quash.

In sum, we conclude that the trial court did not abuse its discretion by declining to strike Dr. Gebel's supplemental expert report. Dr. Gebel's testimony at trial was within the fair scope of his original and/or supplemental expert reports. Furthermore, any error in declining to strike Dr. Gebel's supplemental expert report and/or permitting his trial testimony was harmless. Appellants have waived their challenge to the trial court's restriction on materials that could be used to cross-examine Dr. Traynor. Finally, the trial court did not abuse its discretion in granting Defendants' motions to quash.

Judgment affirmed.

Judgment Entered.

- 21 -

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/21/2015